IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| IDA D. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09-4190-CV-C-ODS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER AND OPINION REVERSING COMMISSIONER'S FINAL DECISION DENYING
BENEFITS AND REMANDING FOR AN AWARD OF BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her disability application. The Commissioner's decision is reversed and remanded for an award of benefits.

I. BACKGROUND

Plaintiff is a 58-year-old female with a work history since 1984 as a post office employee. Plaintiff alleges she became disabled due to psychiatric issues effective December 7, 2006. Plaintiff sought psychiatric help at University Hospital in Columbia, Missouri in 2003. Plaintiff reported that in the late 1980's she began hearing voices telling her to read the Bible. Plaintiff stated she sometimes felt people were talking about her and the examining doctor noted that Plaintiff experienced increased anxiety, paranoia, and nervousness. Plaintiff was diagnosed with major depressive disorder with psychotic features, rule out posttraumatic stress disorder and rule out schizoaffective disorder. Doctors later diagnosed Plaintiff with borderline personality disorder in addition to major depressive disorder.

Plaintiff reported in 2004 that she was "doing fine" on her medications, although she also stated she heard voices "mentally." The examining physician described

Plaintiff's affect as "euthymic"[1] and assigned her a Global Assessment of Functioning (GAF) score of 55.[2]  Plaintiff continued to report in 2004 that she was hearing voices at work or at night and that the voices would tell her to steal or read the Bible.  Plaintiff revealed that she was having trouble keeping pace at work and that she was unable to keep regular attendance due to voices and migraines.  In August 2004 Plaintiff reported that she had missed her last 3 days of work due to anxiety and had been placed on probation for her poor attendance.

Plaintiff's depressed mood seemed to improve through 2004 and in December she reported that she was "doing better" and had missed only 1 day of work.  In January 2005 however Plaintiff reported that she felt overwhelmed by work and "ready to give up."  Plaintiff had missed 2 days of work and had been tearful on the job.  Plaintiff's treating psychiatrist was Jennifer Brockman, M.D., a resident physician.  In an unaddressed letter dated January 21, 2005, Dr. Brockman wrote:

> To Whom It May Concern:
>
> I have followed Ms. Smith personally since September 2004. . . . I have been asked to sign off saying that she is not a danger to herself or others at work.  However, I feel that when Ms. Smith is unstable she does not go to work on those days, knowing her limitations.  Ms. Smith has severe depression, which she battles each day.  She has audio hallucinations, negative self thoughts, crying episodes, lack of energy, feelings of hopelessness, and lack of concentration.
>
> . . . [Ms. Smith] feels depressed about her perceived lack of ability to perform effectively.  Her absence is a sign of her insight into her illness, as she feels she must 'perform' [sic] and appear up-beat [sic] when working

---

[1]  Euthymia is defined as "**1.**  Joyfulness; mental peace and tranquility.  **2.** Moderation of mood, not manic or depressed."   Stedman's Medical Dictionary 678 (28th ed. 2006)

[2]  A GAF score indicates a clinician's judgment of an individual's overall level of functioning.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000).  A score in the 51-60 range reflects an individual with moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* at 34.

with the public. We have discussed her pursuing disability because of her work record and decompensation. . . . [S]he is extremely medication and appointment compliant.

. . . I feel that Ms. Smith and I have a good rapport and understanding of her limits. I only feel comfortable writing she is not a risk to herself or others if she can take days off when not stable. Jan. 8th for example was the day after our last appointment, and she was not stable for employment and would have been ineffective on the job.

In February 2005 Plaintiff reported that her depression was worse and that her brain was "not working." Dr. Brockman wrote a second unaddressed letter February 28, 2005, referring to an application for disability retirement Plaintiff had filed with the post office. This letter states in relevant part:

I feel strongly that working is increasing her depressive and anxiety symptoms and that it is not healthy for her to continue working. This patient is very unstable baseline, and now with her mother's health failing, and a stressful work environment, has decompensated. I have spoken personally with her post master [sic], written numerous letters for her time off and feel that this will be a permanent leave.

She struggles to find enjoyment even outside of work, she is tearful, experiencing anxiety attacks, poor sleep, decreased concentration, decreased motivation, and feeling [sic] of guilt. . . . At home she is falling asleep at times with cigarettes in bed, has difficulty balancing her bank book, and is having great difficulty relating to friends and family with extreme social isolation. She also experienced psychotic symptoms of voices and musical tunes in her head, all of which worsen under stress. . . . I have made numerous medication changes and she continues to struggle.

Dr. Brockman concluded Plaintiff "[was] not safe to continue work and . . . [was] not capable of performing her tasks of working with others and the public."

Plaintiff reported feeling better and less depressed through 2005, but her reports of anxiety and paranoia seemed to increase. In March 2005 Dr. Brockman noted increased anxiety and that Plaintiff was shaking badly. In June 2005 Plaintiff stated that she felt someone was trying to exploit her. Plaintiff reported in July 2005 that she felt

people were talking about her behind her back, and progress notes state Plaintiff was "[p]aranoid about [post] office–involved in conspiracy as [not] politically correct [and] has 'skeletons in the closet.'" The next month Plaintiff stated she was hearing a voice telling her "something's going to happen." Near mid-2005 doctors no longer diagnosed Plaintiff with major depressive disorder, diagnosing her instead with schizoaffective disorder.

In January 2006 Plaintiff's mother passed away. Plaintiff felt "numb" and "withdrawn" but reported to her examining physician that she "was doing well." Plaintiff continued to believe that people were using and talking about her, and in March 2006 she reported that she believed her house was bugged. Plaintiff had her house searched at least once in an effort to locate a surveillance device. Plaintiff continued to hear voices, but they occurred more at night and would wake her up. Plaintiff's GAF score was assessed at 60 in August 2006 and in October 2006. Plaintiff was approved for disability retirement through her job and she quit work December 7, 2006.

Plaintiff reported that she was doing "fine" and that her mood was "fine" in January 2007, although her paranoia and belief that her house was under surveillance persisted. Plaintiff's GAF score was again assessed at 60. Plaintiff filed her Social Security disability application in March 2007. Through 2007 Plaintiff continued to hear voices which sometimes advised her to read the Bible or steal. She remained depressed to a certain degree and continued to experience paranoia. At an appointment in January 2008 Plaintiff reported that she still felt very paranoid that others were constantly talking about her. Plaintiff also stated that she felt her treating doctors were laughing at her and that she was thinking of changing physicians based on her perception. Her examining physician noted Plaintiff appeared unhappy and Plaintiff's GAF score was rated at 50.[3] Plaintiff felt less depressed in June 2008 and stated that she was doing better when she was not around her husband. Although doctors noted

---

[3] A score in the 41-50 range reflects an individual with serious symptoms or serious difficulty in social, occupational, or school functioning. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

"[s]ignificant improvement" during this visit and that she no longer heard voices during the day or at night, Plaintiff remained paranoid that her house was bugged and that people were talking about her. Plaintiff's GAF in October 2008 was 55.

Dr. Armando Favazza was the attending physician most frequently involved with Plaintiff's treatment. Plaintiff's counsel propounded interrogatories to Dr. Favazza. The interrogatories were completed in February 2008, near the time Plaintiff's GAF score was 50. The form contained two sets of handwriting and was signed by Dr. Favazza, U. Ehimare, M.D. (a resident physician who examined Plaintiff in 2008), and a third person whose signature is illegible. The interrogatory responses provided that Plaintiff was "extremely paranoid and delusional" and that her psychotic symptoms could "significantly distort her perception and view of otherwise routine procedures." Plaintiff's ability to understand and remember very short and simple instructions was described as "[l]ikely to be significantly limited by extreme paranoia and psychosis." Similar statements were made regarding Plaintiff's ability to maintain concentration, to stay on schedule and complete a normal workweek, and to sustain and ordinary routine. Plaintiff's ability to work in proximity with others was described as "[e]xtremely limited" by paranoia and included the warning that if she were exposed to such a setting it would present a risk to her and her coworkers. A less severe assessment of Plaintiff was made by Paul Stuve, Ph.D., who reviewed Plaintiff's medical records and completed a mental residual functional capacity assessment. Dr. Stuve concluded that at most Plaintiff experienced only moderate limitations in her functional abilities.

Plaintiff's disability application was denied and an administrative law judge (ALJ) conducted a hearing. Plaintiff testified that she still experienced paranoia and that she generally showered only once or twice per month. Plaintiff also testified that it was mentally exhausting for her to be up for any length of time and that she usually spent her day playing Yahtzee by herself. A vocational expert (VE) testified that Plaintiff was incapable of performing her past work but could perform other jobs in the economy. The VE's testimony was based on a hypothetical by the ALJ describing a worker with the ability to understand, remember, and follow simple instructions and who could tolerate no more than occasional contact with others in a routine work setting with few

changes. When asked to consider the more restrictive limitations in Plaintiff's functional capacity noted in the responses to the interrogatories propounded to Dr. Favazza, the VE testified that Plaintiff would not be able to maintain employment.

The ALJ denied Plaintiff's disability application, giving little weight to the interrogatory responses relied upon by Plaintiff. The ALJ determined these interrogatory responses were less probative than Plaintiff's treatment records, which, according to the ALJ, showed that Plaintiff "generally functioned pretty well." The ALJ also indicated that the interrogatory responses were entitled to less weight because "it [was] impossible to know who actually completed the form and in what order" due to the differing signatures and handwriting. The ALJ further declined to give full weight to Dr. Brockman's statements of disability in her letter, finding that these statements were "job specific." The ALJ's determination of residual functional capacity mirrored the limitations of the hypothetical worker the ALJ described to the VE at the hearing, and the ALJ concluded Plaintiff was capable of performing work in the national economy based on the VE's testimony, precluding a finding of disability.

## II. DISCUSSION

"[R]eview of [the Commissioner's] decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. *Forsythe v. Sullivan*, 926 F.2d 774, 775 (8th Cir. 1991). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Smith v. Schweiker*, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The ALJ's decision is not supported by substantial evidence. The ALJ should

have given controlling weight to the opinion of Dr. Favazza[4] regarding the nature and severity of Plaintiff's impairments. A treating source's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Dr. Favazza's opinion that Plaintiff's extreme paranoia and psychosis rendered her incapable of functioning in a work setting was not inconsistent with substantial evidence in the record. Plaintiff consistently reported her belief that her house was bugged and that others knew or talked about her. The ALJ thought Plaintiff's consistent complaints of paranoia supported the conclusion she was not disabled because the condition had been "unchanged for years" and "did not keep her from working in the past." The fact an impairment does not actually prevent a claimant from working can constitute substantial evidence the claimant was not disabled. *See Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992) (affirming denial of benefits where claimant worked for 11 years after doctor stated she was incapable of working). The record demonstrates however that Plaintiff's psychiatric symptoms caused her severe difficulties and caused her to quit working. The fact Plaintiff worked with these symptoms does not prove Plaintiff was capable of substantial gainful employment.

The ALJ also found Dr. Favazza's opinion inconsistent with Plaintiff's GAF scores, which mostly ranged between 51 and 60 (moderate symptoms). At the time Dr. Favazza responded to the interrogatories in early 2008, however, Plaintiff's GAF was 50 (serious symptoms). Another reason the ALJ gave for discounting Dr. Favazza's opinion was that it was inconsistent with the evidence in the record from June 2008 forward. These records revealed Plaintiff was no longer hearing voices and had improved "significantly," although she still believed her house was bugged. These records are relevant, but they do not prove Plaintiff "had the emotional or mental capacity to work 'day in and day out, in the sometimes competitive and stressful

---

[4] The differing signatures and handwriting on the interrogatories form signed by Dr. Favazza are no reason to doubt that the responses actually reflect his opinion.

conditions in which real people work in the real world.'" *Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004) (citations omitted).  Medical records from the time Plaintiff was working indicate that Plaintiff often missed work because of her mental condition. Plaintiff frequently heard voices and consistently suffered from paranoia, including her belief that her house was bugged and that the post office was involved in a conspiracy. Dr. Brockman, one of Plaintiff's treating physicians, wrote that she was only comfortable certifying that Plaintiff was not a potential threat to herself or others if Plaintiff was permitted to take days off when unstable.  Dr. Brockman later wrote that Plaintiff was "very unstable baseline" and "not safe to continue work."  Regardless of what Plaintiff's later treatment notes may have shown, the ALJ's conclusion that Plaintiff "generally functioned pretty well" is not supported by substantial evidence.  The ALJ erred in discounting Dr. Favazza's opinion.  *See Duncan*, 368 F.3d at 823 (holding that ALJ erred in relying on GAF of 65 in disregarding psychotherapist's opinion of significant impairment; highest GAF in past year was 50 and psychotherapist treated claimant for extended period with consistent documentation of claimant's disabilities).

The ALJ's RFC determination did not reflect the nature or severity of the impairments noted by Dr. Favazza and consequently was not supported by substantial evidence.  The VE's testimony that Plaintiff could perform work existing in significant numbers in the national economy was similarly flawed.  Plaintiff is disabled and entitled to benefits.

## III.  CONCLUSION

The Commissioner's decision is reversed and remanded with instructions to award of benefits.

IT IS SO ORDERED.

/s/ <u>Ortrie D. Smith</u>
ORTRIE D. SMITH, JUDGE
DATE: June 9, 2010                    UNITED STATES DISTRICT COURT